FILED

2017 SEP 13 PM 2: 28

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| Plaintiff, | ) ) | JUDGE BOYKO |
| v. | ) ) | CASE NO. 1:17 CR 369 |
| GARY FINGERHUT, | ) ) | Title 18, Sections 1349, and 1001(a)(2) & (3), United States Code |
| Defendant. | ) | |

The United States Attorney charges:

### General Allegations

At all times material to this Information:

#### A. Defendant and His Association with The Cleveland Clinic

1. Defendant GARY FINGERHUT ("FINGERHUT") was a resident of Solon, Ohio, which was located in the Northern District of Ohio, Eastern Division.

2. FINGERHUT was an employee of The Cleveland Clinic Foundation (the "Clinic"), a not-for-profit corporation that operated a hospital system and related entities. The Clinic was divided into various departments, which included one known as Cleveland Clinic Innovations ("Innovations"). The Clinic's principal place of business, and, in particular, its Innovations department, were both located in Cleveland, Ohio, which is in the Northern District of Ohio, Eastern Division.

3. Innovations was the commercialization arm of the Clinic. It assisted doctors and other Clinic personnel with inventing medical products to advance patient care and marketing those products. If a technology was deemed to merit a new venture, the Clinic, through Innovations, facilitated the formation of, fundraising for, and governance of a spin-off company.

4. FINGERHUT was hired as the General Manger of information technologies for Innovations in or around 2010. In or around 2013, he became Innovations' Executive Director and held this position until in or around June 2015, when the Clinic terminated his employment.

5. In or around 2012, Innovations formed a subsidiary company known as Interactive Visual Health Records ("IVHR") to develop a visual medical charting concept of certain Clinic physicians into a functioning, marketable product. The Clinic wholly owned and funded IVHR during the development period.

6. FINGERHUT was involved in hiring people to work at IVHR, including a person described herein as "W.R." IVHR first hired W.R. as an outside consultant and later as IVHR's Chief Technology Officer. As Chief Technology Officer, W.R. oversaw the actual development of the IVHR product. Among other things, W.R. was responsible for obtaining bids from outside contractors to perform software development services and preparing that information for the selection committee.

7. As a condition of their employment with the Clinic, FINGERHUT and W.R. were obligated and agreed to perform all of their employment responsibilities and duties in the best interests of the Clinic through arms-length transactions. In particular, FINGERHUT and W.R. were prohibited from receiving any sort of financial benefit from and otherwise having any sort of personal or familial financial interest in third-party entities with which the Clinic did business, unless such financial benefits and interests were expressly disclosed to the Clinic and the Clinic

approved the same in advance. FINGERHUT underwent formal training on the Clinic's business ethics and compliance policies, procedures, and requirements every year, including training on disclosure requirements relating to conflicts of interests. FINGERHUT, in turn, informed W.R. of the Clinic's business ethics and compliance policies, procedures, and requirements, including disclosure requirements relating to conflicts of interests.

8. The Clinic relied on FINGERHUT and W.R. to disclose possible conflicts of interest in entering and managing third-party contracts.

### B. The Scheme to Defraud

9. W.R., in conjunction with FINGERHUT and others known and unknown to the United States Attorney, devised and intended to devise a scheme to defraud the Clinic of money and property and of the intangible right to the honest services of FINGERHUT, W.R., and others, and to obtain money and property from the Clinic by means of materially false and fraudulent pretenses, representations, and promises.

10. It was part of the scheme and artifice to defraud that FINGERHUT and W.R. affirmatively represented to the Clinic that they were abiding by their agreement to perform all of their employment responsibilities and duties in the best interests of the Clinic through arms-length transactions when, in truth and in fact and as FINGERHUT and W.R. then well knew, they were not.

11. It was further part of the scheme and artifice to defraud that FINGERHUT and W.R. failed to disclose to the Clinic that they were causing the Clinic to enter into contracts and remain in contracts with one or more business entities in which FINGERHUT and W.R. had a personal financial interest.

12. It was further part of the scheme and artifice to defraud that W.R. and others incorporated and caused to be incorporated a shell company known as iStarFZE LLC ("ISTAR"), that did not itself perform or provide any actual goods or services.

13. It was further part of the scheme and artifice to defraud that W.R. and others established ISTAR in the name of a nominee owner to conceal from the Clinic that W.R. was ISTAR's true owner and financial beneficiary.

14. It was further part of the scheme and artifice to defraud that W.R. caused ISTAR to hire a third-party company with the initials J.M., located outside the United States, to perform software development and related services on ISTAR's behalf.

15. It was further part of the scheme and artifice to defraud that W.R. caused ISTAR to establish a mailing address, but not actual physical presence, in New York, New York, to create the false impression that it had a place of business located there.

16. It was further part of the scheme and artifice to defraud that W.R. caused ISTAR to establish an internet website and email addresses to create the false impression that it was an operational business entity.

17. It was further part of the scheme and artifice to defraud that W.R. caused ISTAR to submit a bid to the Clinic to develop and design the software for IVHR's medical charting product, without disclosing that J.M., not ISTAR, would actually perform the contracted software development services.

18. It was further part of the scheme and artifice to defraud that W.R. caused ISTAR, in its bid, to increase the price that the Clinic paid for the software design and development services that J.M. performed, without disclosing that J.M. had agreed to charge a lesser amount and without disclosing W.R.'s financial interest in ISTAR.

4

19. It was further part of the scheme and artifice to defraud that W.R. diverted the difference in price between the amount ISTAR charged the Clinic for software development services and the amount that J.M. charged ISTAR for software development services to bank accounts that W.R. controlled, for W.R. to enrich himself and to pay others to assist him with this fraudulent scheme.

20. It was further part of the scheme and artifice to defraud that W.R. periodically paid FINGERHUT a "referral" or "commission" fee, which FINGERHUT accepted, in return for FINGERHUT not disclosing the scheme to defraud, and thereby permitting ISTAR to keep the IVHR software development contract and obtain inflated payments from the Clinic.

21. It was further part of the scheme and artifice to defraud that W.R. caused one or more bank accounts to be established to receive the profits of W.R. and FINGERHUT's scheme to defraud the Clinic, and to transfer the proceeds of the scheme to W.R., FINGERHUT, and others.

## COUNT 1
**(Conspiracy to Commit Wire Fraud and Honest Services Wire Fraud, 18 U.S.C. §§ 1343 and 1346, all in violation of 18 U.S.C. § 1349)**

22. The factual allegations of paragraphs 1 through 21 of this Information are realleged and incorporated by references as if fully set forth herein.

23. From in or around March 2012 and continuing through on or about June 15, 2015, in the Northern District of Ohio, Eastern Division, and elsewhere, GARY FINGERHUT, W.R, and others known and unknown to the United States Attorney, did knowingly and intentionally combine, conspire, confederate and agree together and with each other to devise and intend to devise a scheme and artifice to defraud the Clinic of money and property and of the intangible right to the honest services of FINGERHUT, W.R., and others, and to obtain money and property

from the Clinic by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme and artifice to defraud, caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## Object of the Conspiracy

24. The object of the conspiracy was to enrich FINGERHUT, W.R., and others via a fraudulent scheme that diverted approximately $2.7 million from the Clinic by inserting a company in which FINGERHUT and W.R. had concealed financial interests into transactions wherein the Clinic purchased software development services and thereby increasing the amount that the Clinic paid as a result.

## Acts In Furtherance of the Conspiracy

25. On or about August 9, 2012, W.R. gave FINGERHUT a "referral fee" check in the amount of $25,000 that was the proceeds of a Clinic payment to ISTAR, which FINGERHUT deposited into a bank account that he controlled.

26. On or about September 13, 2012, W.R. caused the Clinic to transfer $45,540 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

27. On or about September 28, 2012, W.R. caused $8,000 to be transferred from a bank account titled to ISTAR to a personal bank account that he controlled.

28. On or about October 23, 2012, W.R. caused $27,000 to be transferred from a bank account titled to ISTAR to a personal bank account that he controlled.

29. On or about November 9, 2012, W.R. caused the Clinic to transfer $62,240 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

30. On or about November 16, 2012, W.R. caused $7,425 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

31. On or about December 14, 2012, W.R. caused the Clinic to transfer $71,392.34 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

32. On or about January 4, 2013, W.R. caused $10,000 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

33. On or about March 13, 2013, W.R. caused the Clinic to transfer $75,754.67 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

34. On or about March 14, 2013, W.R. caused $60,000 to be transferred from a bank account titled to ISTAR to a bank account on which he was a signatory.

35. On or about April 4, 2013, W.R. caused $7,110 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

36. On or about July 9, 2013, W.R. caused $40,000 from the proceeds of a Clinic payment to ISTAR to be transferred to a personal account that he controlled.

37. On or about July 12, 2013, W.R. caused the Clinic to transfer $190,496.67 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

38. On or about July 23, 2013, W.R. caused $17,100 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

39. On or about September 13, 2013, W.R. caused the Clinic to transfer $264,993 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

40. On or about September 18, 2013, W.R. caused $98,000 to be transferred from a bank account titled to ISTAR to a bank account on which he was a signatory.

41. On or about September 20, 2013, W.R. caused $20,000 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

42. On or about October 22, 2014, W.R. caused the Clinic to transfer $274,872 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

43. On or about October 29, 2014, W.R. caused $60,000 to be transferred from a bank account titled to ISTAR to a bank account on which he was a signatory.

44. On or about November 3, 2014, W.R. caused $31,000 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

45. On or about December 23, 2014, W.R. caused the Clinic to transfer $179,958 to ISTAR to pay invoices in which W.R. had marked up the cost of services that J.M. had provided to the Clinic in order to divert money to W.R., FINGERHUT, and others.

46. On or about December 31, 2014, W.R. caused $93,000 to be transferred from a bank account titled to ISTAR to a bank account on which he was a signatory.

47. On or about January 14, 2015, W.R. caused $12,000 from the proceeds of a Clinic payment to ISTAR to be transferred to FINGERHUT as a "referral fee," which FINGERHUT accepted.

## The Use of Interstate Wires in Furtherance of the Conspiracy

48. For the purpose of executing and attempting to execute the scheme and artifice to defraud described above, FINGERHUT, W.R., and others caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, to and from the Northern District of Ohio and elsewhere. Such interstate wires included, but were not limited to the following:

| Date | Description of Interstate Wire | Origination Location | Recipient Location |
|---|---|---|---|
| September 13, 2012 | Check #5730 in the amount of $45,540 | Cleveland Clinic PNC Bank, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, San Francisco, California, through St. Paul, Minnesota |
| September 28, 2012 | Check #5004 in the amount of $8,000 | ISTAR U.S. Bank Account x8603, California | Huntington Bank Account x6345 (controlled by W.R.), Lakewood, Ohio |
| October 23, 2012 | Wire Transfer of $27,000 | ISTAR U.S. Bank Account x8603, California | PNC Bank Acct x9116, (controlled by W.R. & M.R.) Cleveland, Ohio |
| November 9, 2012 | Wire transfer of $62,240 in payment of ISTAR invoices | Cleveland Clinic PNC Bank, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, San Francisco, California |

| | | | |
|---|---|---|---|
| November 16, 2012 | Wire transfer of $7,425 | Huntington Bank Acct x6345 (controlled by W.R.), Lakewood, Ohio | FINGERHUT U.S. Bank Acct x1873, St. Paul, Minnesota |
| December 4, 2012 | Wire transfer of $71,392.34 | Cleveland Clinic PNC Bank Acct, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, San Francisco, California |
| January 4, 2013 | Wire transfer of $10,000 | Huntington Bank Acct x6345 (controlled by W.R.), Lakewood, Ohio | FINGERHUT U.S. Bank Acct x1873, St. Paul, Minnesota |
| March 13, 2013 | Wire transfer of $75,754.67 | Cleveland Clinic PNC Bank Acct, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, San Francisco, California |
| March 14, 2013 | Wire transfer of $60,000 | ISTAR U.S. Bank Acct x8603, San Francisco, California | PNC Bank Acct x9116 (controlled by W.R.), Cleveland, Ohio |
| July 9, 2013 | Wire transfer of $40,000 | ISTAR U.S. Bank Acct x8603, San Francisco, California | PNC Bank Acct X9116 (Controlled by W.R.), Cleveland, Ohio |
| July 12, 2013 | Electronic deposit/ACH of $190,496.67 | Cleveland Clinic PNC Bank Acct, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, California |
| July 23, 2013 | Wire transfer of $17,100 | Huntington Bank Acct x6345 (controlled by W.R.), Lakewood, Ohio | FINGERHUT U.S. Bank Acct x1873, St. Paul, Minnesota |
| September 13, 2013 | Electronic deposit/ACH of $264,993 | Cleveland Clinic PNC Bank Acct, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, California |
| September 18, 2013 | Wire transfer of $98,000 | ISTAR U.S. Bank Acct x8603, San Francisco, California | Huntington Bank Acct x6345 (controlled by W.R.), Lakewood, Ohio |
| October 22, 2014, | Wire transfer of $274,872 | Cleveland Clinic PNC Bank Acct x1715, Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, San Francisco, California |
| October 29, 2014, | Wire transfer of $60,000 | ISTAR U.S. Bank Acct x8603, San Francisco, California | Huntington Bank Acct x6345 (controlled by W.R.), Lakewood, Ohio |
| December 23, 2014 | Electronic deposit/ACH of $179,958 | Cleveland Clinic PNC Bank Acct Cleveland, Ohio | ISTAR U.S. Bank Acct x8603, California |
| December 31, 2014 | Wire transfer of $93,000 | ISTAR U.S. Bank Acct x8603, San Francisco, California | Huntington Bank Acct x6345 (controlled by W.R.), Lakewood, Ohio |

**Effect of the Scheme**

49. As a result of Defendant and his co-conspirators' fraudulent scheme and conduct, the Clinic sustained a loss of approximately $2,784,847.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (False Statement and False Document, in violation of 18 U.S.C. § 1001(a)(2)&(a)(3))

50. The factual allegations of paragraphs 1 through 21 and 25 through 49 are realleged and incorporated by reference as if fully set forth herein.

51. From in or around September 2014 through on or about the date of this Information, the Federal Bureau of Investigation ("FBI"), which was part of the executive branch of the Government of the United States, acting in a matter within its jurisdiction, was investigating GARY FINGERHUT, W.R., and others, in connection with their involvement and actions relating to ISTAR's contracting activities with the Clinic.

52. From on or about December 16, 2014, through on or about the date of this Information, a Federal Grand Jury sitting in the Northern District of Ohio was conducting a criminal investigation, pursuant to its powers as set forth under Rule 6 of the Federal Rules of Criminal Procedure, into the activities of GARY FINGERHUT, W.R., and others, in connection with their involvement and actions relating to ISTAR's contracting activities with the Clinic.

53. On or about June 22, 2015, a Special Agent of the FBI interviewed FINGERHUT in connection with the investigation.

54. On or about June 22, 2015, in the Northern District of Ohio, Eastern Division, GARY FINGERHUT, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully (a) made the following materially false, fictitious, and fraudulent statements and representations, and (b) made and used the

11

following false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements:

    a.    FINGERHUT stated to an FBI Special Agent that he was not aware of W.R. having any business dealings outside of the Clinic and that he was not aware of "any connection" between W.R. and ISTAR. In truth and in fact, as FINGERHUT then well knew, FINGERHUT was aware that W.R. had a financial interest in ISTAR's contract with the Clinic and was receiving "referral fees" in which he shared.

    b.    FINGERHUT stated to an FBI Special Agent, first, that he had borrowed $100,000 from W.R. several years earlier for a home loan, and then, that he had borrowed $100,000 to $200,000 from W.R. and then later, that he had borrowed at least $350,000 from W.R. for personal expenses over the past few years. FINGERHUT further stated that he had signed a note at the time of such loan, and that he intended to pay back the loan with interest. In truth and in fact, as FINGERHUT then well knew, FINGERHUT had not borrowed any money from W.R. at any time. Instead, all money that FINGERHUT received from W.R. between August 2012 and March 2015 (approximately $469,000) was kickback "referral" or "commission" fees paid in return for FINGERHUT permitting ISTAR to keep the IVHR software development contract and obtain inflated payments from the Clinic; FINGERHUT had no intent to pay back the money that he received. Further, in truth and in fact, as FINGERHUT then well knew, FINGERHUT and W.R. created a fake loan document to cover up the true purpose of W.R.'s payments to FINGERHUT.

55.    FINGERHUT made the false statements and created the fake loan document described above with the intent to corruptly obstruct, influence and impede and to attempt to obstruct, influence and impede the FBI and Federal Grand Jury investigations described above.

Defendant's false statements and documents caused Special Agents of the FBI to perform additional investigation.

All in violation of Title 18, United States Code, Section 1001(a)(2) and (3).

JUSTIN E. HERDMAN
United States Attorney

By: *Ann C. Rowland*
ANN ROWLAND
Deputy Chief, Criminal Division